J-A13011-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 82 MDA 2023 |

Appeal from the Order Entered December 9, 2022
In the Court of Common Pleas of Franklin County Juvenile Division at
No(s):  CP-28-DP-0000049-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 83 MDA 2023 |

Appeal from the Order Entered December 9, 2022
In the Court of Common Pleas of Franklin County Juvenile Division at
No(s):  CP-28-DP-0000050-2019

BEFORE:   BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                **FILED: JULY 26, 2023**

D.D. ("Father") appeals the December 9, 2022 order changing the respective permanency goals as to his daughter, A.D., born in April 2014, and his son, D.D., born in January 2016.[1]  After careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] A.K. ("Mother") did not appeal these orders.  Instead, Mother appealed a December 9, 2022 order finding aggravated circumstances pursuant to 42 Pa.C.S. § 6341(c.1).  We address her claims in a separate memorandum.

We glean the relevant factual and procedural history of this matter from the certified record. Franklin County Children and Youth Services ("CYS" or "the agency") first became involved with this family in June 2019, when it assumed emergency custody of A.D. and D.D. following allegations of inappropriate contact between A.D. and her paternal grandfather ("Paternal Grandfather"). *See* N.T., 12/8/22, at 49. We note that Father and Mother were never married and, at the time of this initial referral, they were living separately and exercised equally shared physical custody of A.D. and D.D. under an informal arrangement. *Id*. at 79.

Specifically, Father was living with his mother and Paternal Grandfather when A.D. made these disclosures. *See* N.T., 12/8/22, at 5-6, 28. Paternal Grandfather is a sexual offender who was required to register pursuant to the Sexual Offender Registration and Notification Act ("SORNA"). He failed to do so, was arrested, and was later released on bail upon the condition that he have no "unsupervised contact" with minors, including his grandchildren. *Id.* at 17. Despite this restriction, Father refused to follow a recommended "safety plan" to "ensure that the children were not with [Paternal Grandfather] for any unsupervised amount of time[.]" *Id*. at 28-29. A.D. and D.D. were declared dependent and placed in emergency foster care, which lasted from approximately June 2019 through April 2021. Father participated in supervised visits with the children for the first year of this placement. *Id*. at 52-53, 79. However, he was eventually discharged for nonparticipation from two different visitation programs. *Id*.

- 2 -

A.D. and D.D. were restored to Mother's custody in April 2021, and their initial dependency was concluded in August 2021. Father remained living with his parents at this point and the prior custody arrangement did not resume. *Id*. at 81-82. Despite being advised that he could seek modifications through the courts, Father declined to take any legal action with respect to obtaining shared custody or visitation rights as to A.D. and D.D. *Id*. at 13, 82. Father also declined to contact the agency to receive additional services. *Id*. at 101-02. Beginning in March 2022, Father was arrested and, ultimately, incarcerated for his third driving under the influence ("DUI") offense, which resulted in a one-year term of incarceration with an anticipated release date of March 18, 2023. *Id*. at 85. Thus, Father's contact with A.D. and D.D. ended in approximately June 2020 and did not resume. *Id*. at 86, 94.

At some point after he was incarcerated, Father finally underwent a mental health evaluation indicating that he has problems with depression and anxiety. *Id*. at 83, 91. However, he never provided the results of this purported evaluation to the agency or the trial court. *Id*. at 91. During this first period of dependency in this matter, Father also failed to engage with recommended services to improve his parenting skills. *Id*. at 11-12.

In May 2022, while Father was incarcerated,

> the agency sought and was granted emergency protective custody of A.D. and D.D. based on allegations that they had insufficiently explained marks and bruises and the school nurse was concerned that the children were not safe. A.D. and D.D. were placed in foster care. A dependency petition was filed alleging the children were without proper parental care or control. A shelter care

> hearing was held on May 12, 2022, after which they were placed in the legal and physical custody of the agency with placement continuing in foster care.
>
> [A]n adjudicatory hearing took place on June 10 and June 17, 2022, after which . . . the trial court on July 7, 2022, found clear and convincing evidence to substantiate the allegations in the dependency petition.

Trial Court Opinion, 2/2/23, at 2-3 (cleaned up). The permanency goals for A.D. and D.D. were initially set at reunification. *See* N.T., 12/8/22, at 35.

Thereafter, the agency filed petitions seeking to, *inter alia*, change the permanency goals for A.D. and D.D. from reunification to adoption. On December 6 and 8, 2022, the trial court conducted evidentiary hearings on the petitions, wherein the agency adduced testimony from a number of individuals, including Emilee Baker, director of Alternative Behavior Consultants ("ABC"), which provided services to Father, and CYS caseworker Gayle Schreiber. Father also testified in his own behalf. On December 9, 2022, the trial court entered orders changing the permanency goals with respect to A.D. and D.D. from reunification to adoption.

Father filed separate, timely notices of appeal in both above-captioned cases, along with concise statements of errors pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive opinion pursuant to Rule 1925(a)(2)(ii). Finally, this Court consolidated these cases *sua sponte* pursuant to Pa.R.A.P. 513.

Father has purported to raise a single issue for our consideration: "Whether the trial court abused its discretion in its permanency review of order

- 4 -

of December 9, 2022, when it changed the permanency goal from reunification to adoption in regards to [Father]?" Father's brief at 5.

Although framed as a single issue, Father's substantive arguments actually touch upon several separate-but-related concerns. Namely, Father argues that: (1) he should be excused from failing to comply with the permanency goal directives due to his incarceration; (2) the record did not support a conclusion that he failed to maintain contact with A.D. and D.D.; (3) the trial court erred in finding Father was not a "reunification resource;" and (4) the trial court inappropriately focused upon Father's "actions or inaction," as opposed to the "best interests" of the children. Father's brief at 10-15. We will address the merits of each of these assertions, in turn.

This Court reviews a trial court's permanency determinations for an abuse of discretion. *See Interest of J.B.*, \_\_\_ A.3d \_\_\_, 2023 PA Super 100, at \*3 (Pa.Super. 2023). In this context, an abuse of discretion occurs only if the record reflects that the court's judgment was manifestly unreasonable, it did not correctly apply the law, or its action was the result of partiality, prejudice, bias or ill will. *See Interest of H.J.*, 206 A.3d 22, 25 (Pa.Super. 2019) (cleaned up). We must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record," but we are not bound by the trial court's "inferences or conclusions of law." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). This Court defers to the trial judges, "who see and hear the parties and can determine the credibility to be placed

on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan." *Id*. We are "not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id*.

Permanency goal change proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-75. In particular, 42 Pa.C.S. § 6351(f) mandates that a trial court consider a number of discrete factors in adjudicating a goal change petition including, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the appropriateness, feasibility, and extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) the likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. *See J.B.*, *supra* at *3-*4 (citing *In re A.B.*, 19 A.3d 1084, 1088 (Pa.Super. 2011)); *see also* 42 Pa.C.S. § 6351(f)(1)-(5), (6), (9).

However, the polestar of any dependency matter must be the "safety, permanency[,] and well-being of the child," which takes precedence "over all other considerations, including the conduct and the rights of the parent." *In the Interest of M.T.*, 101 A.3d 1163, 1175 (Pa.Super. 2014). Therefore, "[w]hile parental progress toward completion of a permanency plan is an important fact, it is not to be elevated to determinative status, to the exclusion

of all other factors." *Id*. In short, "a child's life cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d 818, 824 (Pa.Super. 2006).

With respect to his first line of argument, Father asserts that his failure to make progress on his permanency goals were the result of his incarceration. *See* Father's brief at 11 ("It was uncontroverted that [Father] was incarcerated throughout the entire duration of the children's second placement and could not comply with the [a]gency's requirements. . . . A lack of participation in services three years prior is not sufficient to show lack of compliance during the children's current placement[.]").

To the extent that Father is arguing that it was inappropriate for the trial court to consider the undeniable fact of his incarceration, we must disagree. This Court has held that even a parent who has made "substantial progress towards completion of his or her permanency plan" is not immunized from the inescapable considerations related to incarceration in the dependency context:

> [T]he progress that [the parent] made on his permanency plan prior to his incarceration must be measured against the reality of his circumstances at present, which are that [the parent] is unable to provide for any of the needs of his children with regard to housing, other basic necessities, and day-to-day love, emotional support and guidance. While [the parent's] efforts in cooperating with the [a]gency and working toward his permanency plan goals may deserve credit, [the parent's] other actions . . . have resulted in his . . . imprisonment.

*In re A.K.*, 936 A.2d 528, 534 (Pa.Super. 2007).

Instantly and unlike the parent in **A.K.**, Father has manifested only intransigence with respect to the directives or suggestions advanced by the trial court or the agency prior to his incarceration. **See** N.T., 12/8/22, at 11-12, 83, 91. When the troubling allegations concerning A.D. and Paternal Grandfather arose, Father flatly refused to cooperate in implementing a safety plan to prevent unsupervised contact between Paternal Grandfather and the children. **Id**. at 28-29. Indeed, by his own admission, Father had already been voluntarily out of contact with A.D. and D.D. for approximately one year at the time his incarceration began. **Id**. at 86, 94. Thus, the lack of progress that Father attempts to attribute to his incarceration seems merely to be a continuation of his prior stagnation. As the trial court adroitly observed: "Incarcerated parents maintain connections and meaningful relationships with their children every day. However, even before his most recent incarceration, Father's compliance with the prior permanency plan was inconsistent at first and then ceased all together." Trial Court Opinion, 2/2/23, at 33-37.

As detailed above, we observe no abuse of discretion in the trial court's conclusions. Furthermore, we reject Father's suggestion that the trial court was not permitted to consider the realities of his incarceration in rendering a dependency decision. **See A.K.**, **supra** at 534. No relief is due.

Turning to the second aspect of Father's argument, he asserts that the record does not support a conclusion that he failed to maintain contact with A.D. and D.D. **See** Father's brief at 12-13. Specifically, he alleges his failure

to stay in touch with the children was caused by a lack of communication from the agency. *Id*. at 12 ("[T]he evidence showed that [Father] was not given any information on ways to contact the children."). We must disagree.

The trial court concluded that Father's lack of contact with A.D. and D.D. was entirely a result of his own behavior and choices:

> Father has not seen his children since some time in 2020 when he voluntarily "absented" himself from his children's lives. He stopped participating in visits after deciding that the Agency had "sided with" Mother, so, rather than continuing to work on the reunification services he was offered, he removed himself from the reunification equation.
>
> . . . .
>
> Father has not sent letters, cards, or gifts to the children. He has similarly not requested the opportunity to speak with the children by phone or to have visits in the prison. He has not attempted to find out how to do so or even if these things are possible. His testimony seems to suggest that it was the agency's sole obligation to provide him with the means to contact his children and that he was otherwise not responsible for doing so. . . .

Trial Court Opinion, 2/2/23, at (cleaned up).

The certified record fully supports the trial court's conclusions, while refuting Father's claim of agency error. Indeed, Father's own testimony indicates that his failure to stay in contact with the children was the result of his own questionable decision-making. Specifically, Father attested that he voluntarily ceased participating in visitations with A.D. and D.D. due to emotional fatigue and a belief the agency favored Mother over him:

Q. At one point did you stop attending visits?

A. Yes.

Q.     Why?

A.     I got tired of the questions from [A.D.] and [D.D] as to [the allegations of sexual abuse against Paternal Grandfather]. I got tired of lying. I was told I was not allowed to address what [A.D.] disclosed as to why she wasn't allowed to see [Paternal Grandfather]. Also it came to my knowledge that they were switching sides. First, they were kind of for me to get the kids back and then they went towards [Mother]. At that point it was [sic] already been a year. In my opinion[,] it was best for one of us to have them than neither of us, whatever was [sic] quickest possible way to get them out of foster care, so I went absent.

N.T., 12/8/22, at 79-80.

After A.D. and D.D. were returned to Mother's custody, Father acknowledged that he was advised by a representative of the agency that he would need to file a petition with the court in order to seek a modification of custody, *i.e.*, in order to re-establish contact and involvement with his children. *Id*. at 81-82. However, Father was in a "very depressive state," and he neglected to take any action to re-establish contact with his children aside from an alleged, half-hearted attempt to message Mother on Facebook. *Id*. at 82. Thereafter, Father was incarcerated, during which time he continued to make no efforts whatsoever to reach out to A.D. and D.D. *Id*. at 84-85. During this time, however, the agency also reached out to him on at least two occasions to unsuccessfully try and facilitate his participation in dependency proceedings. *Id*. at 54.

We recognize that Father now believes that his voluntary decision to "absent" himself from his children's life was a "mistake" that he "deeply

regrets." *Id*. at 95-96. However, we observe no basis upon which to assign any culpability to the agency. To the contrary, the record reflects that representatives from the agency unsuccessfully contacted Father on multiple occasions in an attempt to involve him in the children's lives. *Id*. at 54, 81-82. Throughout these proceedings, Father voluntarily chose to remove himself from the lives of A.D. and D.D. Furthermore, he flatly refused to contact the agency to seek more information or inquire as to how he could contact A.D. and D.D. *Id*. at 101, 104. Thus, the trial court's conclusions are well-supported by the record. We observe no basis upon which to conclude the agency was somehow responsible for Father's lack of contact with A.D. and D.D. *See In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010) ("The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided.").

Father's third line of argument concerns the trial court's conclusion that he was not a "reunification resource." Father's brief at 13-14. Specifically, he avers that "[t]he trial court's conclusion that [Father] cannot provide a suitable home for reunification simply is not supported by the facts of record." *Id*. at 14. As above, the lynchpin of Father's argument on this point is that the trial court inappropriately focused upon the fact of Father's incarceration. *Id*. at 14. To the extent Father suggests that it was improper for the trial court to consider the impediments caused by his imprisonment in changing the permanency goals, he is mistaken. *See A.K.*, *supra* at 534.

The remainder of Father's argument asserts that the trial court failed to credit Father's speculative assertions that he would: (1) be released as scheduled; (2) be able to obtain alternative housing apart from his parents, including Paternal Grandfather; and (3) that he would resume contact with his children. *See* Father's brief at 14. We discern Father is essentially asking this Court to re-weigh the evidence and reach a different conclusion than the trial court. We emphasize that we are not permitted to supplant the credibility and factual findings of the trial court where they are supported by the record. *See R.J.T., supra* at 1190. Furthermore, our review finds that the trial court's challenged conclusions are well-supported by the certified record.

Specifically, the trial court found as follows:

Father is presently incarcerated and eligible for parole in March 2023, for his third controlled substance DUI. At present, his plan is to return to the home of his parents. Given the allegation made by A.D. involving Paternal Grandfather (regardless of whether the allegations were founded, unfounded or otherwise) and Paternal Grandfather's prior requirement to register under SORNA for a sexual assault conviction, we cannot find that paternal grandparents' home is an appropriate place for reunification of the children in the near future. We also note that Father was not willing in the past to comply with a safety plan with respect to his children and their access to [Paternal Grandfather].

Further, Father acknowledged that he is not ready to have the children in his care at this time. Even upon release [from incarceration], he agreed that he will need a period of time to become reacquainted with them through supervised visits. Accordingly, there is no likely or realistic date by which reunification with Father can be achieved.

. . . .

> [G]iven his history of compliance and his current inability to parent the children, Father is not a reunification resource. . . . Given this record, we find that the children's best interests, including their safety, permanency, and well-being . . . demand that the goal of reunification be changed to adoption.

Trial Court Opinion, 2/2/23, at 33-34, 37.

Father's own testimony supports the trial court's conclusions above. Specifically, Father testified that he would return to living with his parents following his anticipated release from prison in March 2023. *See* N.T., 12/8/22, at 85-86. While Father claimed that this living arrangement would only be "temporary," he concomitantly acknowledged that he would be unable to immediately resume parental duties upon being release from prison:

> Q. You're recognizing that even if [the reunification process] were to begin when you were released from jail that would take some time then, that you have some things left unfinished that you need to work on in order to accomplish that?
>
> A. Yes.

N.T., 12/8/22, at 95. Indeed, when asked an open-ended question as to what he believed his primary parental "deficiencies" were, Father admitted that he needed help: "Everywhere." *Id*. at 105.

Based upon the foregoing testimony, the trial court's findings with respect to Father's inability to be a "reunification resource" is supported by the certified record. Thus, we are bound by the court's conclusions. *See* ***R.J.T., supra*** at 1190. Thus, Father's third claim also fails.

Father's fourth and final assertion concerns the trial court's alleged failure to address the "best interests" of A.D. and D.D. *See* Father's brief at

15 ("[T]he trial court cites [Father's] actions or inaction to justify the goal change rather than citing why the goal change is in the best interests of the children."). Specifically, Father claims that "the record is devoid of any evidence or testimony in regards to why it is not in the children's best interests to be reunified with Father." *Id*. at 16. We must disagree.

As detailed above, the record unanimously reflects that Father absented himself from the lives of A.D. and D.D. for approximately two years. Furthermore, at the time of the proceedings in this matter, Father remained incarcerated and was completely unable to care for A.D. and D.D. until at least March 2023. Assuming, *arguendo*, that Father was released on time, he also conceded that he would not be able to immediately assume parental duties and would need additional services from the agency, as well as an opportunity to obtain alternative housing. *Id*. at 94-95. Indeed, Father even acknowledged that his deficiencies as a parent were essentially universal in scope. *Id*. at 105. Thus, Father's position appears to be that the trial court should have held this matter in perpetual abeyance, placing the children in limbo while Father was afforded an open-ended opportunity to better himself.

We note that Father seems unable to connect the deleterious impact of his actions and inactions upon A.D. and D.D. Due to Father's own choices, he has been completely absent from the children's lives for over two years at the time of the hearings in these proceedings. Furthermore, he has refused to cooperate with the agency concerning his parental skills, the concerns

regarding Paternal Grandfather, or visitations with the children. Although Father espouses new promises of diligence, we emphasize that "a child's life cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **N.C.**, **supra** at 824. The policy underlying the Juvenile Act is "to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." **Id**. at 823.

As detailed above, there is no date certain on which Father might resume caring for A.D. and D.D. Furthermore, we also note that both A.D. and D.D. have been diagnosed with significant mental health problems that require therapy and regular care. **See** N.T., 12/8/22, at 31, 33, 36. Thus, any further delays in long-term permanency and stability for A.D. and D.D. is an even greater, instant concern. **See N.C.**, **supra** at 823-24. If credited, Father's arguments would essentially supplant one of the bedrock notions of dependency proceedings, *i.e.*, permanency and stability of the child. **See In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa.Super. 2006) ("The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.").

Based upon the discussion detailed above, we observe no abuse of discretion or error law in the trial court's determination with respect to the best interests of A.D. and D.D. and conclude that the trial court's analysis

comports with the relevant considerations outlined in § 6351(f) concerning the matters to be determined at the permanency review hearing.[2]

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2023

---

[2] We note that the trial court did not "itemize" its findings and that A.D. and D.D. had been in placement for only seven months at the time that the trial court entered the December 9, 2022 goal change order, which is less than the fifteen-to-twenty-two-month period highlighted in § 6351(f)(9). However, this Court has explained that § 6351(f)(9) is "merely one of a number of factors a trial court must consider in ultimately determining whether the current placement is appropriate or if and when another placement would be appropriate based upon the trial court's assessment of what is best suited to the safety, protection and physical, mental and moral welfare of the child." *In re R.J.T.*, 9 A.3d 1179, 1191 (Pa. 2010) (also upholding trial court reasoning that obviously "considered the various factors of § 6351(f)" even where it "failed to itemize its findings").